IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 15–cv–02124–KMT

DIANE H. SHUCK,

       Plaintiff/Counterclaim Defendant,

v.

ACADEMY SCHOOL DISTRICT 20,

       Defendant/Counterclaim Plaintiff,

and

LINDA VAN MATRE,
TRACEY JOHNSON,
CATHERINE BULLOCK,
LARRY BORLAND,
GLENN STREBE,
DAVID PEAK,
SUSAN FIELD, and
TORIA MCGILL, in their official and individual capacities,

       Defendants.

---

## ORDER

---

This matter is before the court on "Defendants' Partial Motion for Summary Judgment."

(Doc. No. 51 ["Mot."].)  Plaintiff filed a Response (Doc. No. 54 ["Resp."]), to which Defendants

replied.  (Doc. No. 56 ["Reply"].)

**Facts[1]**

Plaintiff began her employment with Defendant Academy School District 20 (ASD20) for Air Academy High School ("AAHS") in 1992 as a part-time physical education teacher. (Doc. No. 51-1 at pp. 35-36.)[2] Plaintiff was responsible for familiarizing herself with and abiding "by federal and state laws and regulations relevant to their work as well as district administrative policies of the Board of Education as posted on the district intranet." (*Id.* at 42; Doc. No. 51-3 at 1.) Plaintiff held the part time physical education teacher position for eight years, and also ran student government and acted as activities director. (*Id.* at 36-37.) Plaintiff became an athletic coordinator for AAHS in 1998-99 and reported directly to the AAHS Principal. (*Id.* at 37-38.) Plaintiff obtained her principal license in 2002 and was named AAHS Assistant Principal/Athletic Director in 2003. (*Id.* at 38.) Plaintiff held that position until 2015. (*Id.* at 73.)

On January 23, 2015, the AAHS Principal, Defendant Toria McGill, gave a mid-year review to AAHS's new bookkeeper, Deborah Elges. (Doc. No. 51-4 at 70-71.) During that review, Ms. Elges raised a concern regarding Plaintiff. Ms. Elges began by explaining Plaintiff had previously told her that ASD20 and Defendant McGill were upset with Plaintiff because some assistant coaches had worked with kids without first going through a background check. (*Id.* at 72.) One of them, Eric Goldberg, who was the baseball coach's son, had subsequently failed his background check due to DUIs on his record. (*Id.* at 72-73.) Sometime after that conversation but before January 23, 2015, Plaintiff asked Ms. Elges to write a check to Doug

---

[1] The following facts are undisputed unless specifically noted otherwise.
[2] When citing deposition testimony, the court uses the page references in the original deposition transcript.

2

Goldberg, the baseball coach, in order to pay Eric Goldberg. (*Id.* at 73.) Ms. Elges testified she refused and told Defendant McGill during her review that the request made her uncomfortable. (*Id.*)[3] Ms. Elges also told Defendant McGill that Plaintiff's son had previously been paid for work he had done for the hockey team. (Doc. No. 51-5 at 111-12.) Defendant McGill halted the review, telling Ms. Elges that they would need to reschedule the remainder. (*Id.* at 112-13.) Defendant McGill called her supervisor, Deputy Superintendent Karin Reynolds, and Defendant David Peak, Assistant Superintendent of Human Resources. (*Id.*)

Later the same day, Defendant McGill called Plaintiff into her office for a meeting with Defendant Peak and her. (Doc. No. 51-1 at 79.) Defendant McGill raised concerns regarding paying Plaintiff's son and paying volunteers who had not completed the district mandated process. (*Id.*) Following the meeting, Defendant McGill placed Plaintiff on administrative leave and took Plaintiff's keys and badge. (*Id.*)

After the meeting, Defendant Peak directed his staff to check the status of background checks of individuals mentioned by Ms. Elges. (Doc. No. 51-7 at 84-85.) Defendant Peak and Tom Gregory, the Chief Financial Officer, spoke with Defendant McGill, Ms. Elges, Plaintiff's Administrative Assistant, Krystal Whitson, and Austin Lee, an AAHS teacher and co-sponsor of student council. (*Id.* at 85-86.) Mr. Gregory also initiated an internal audit. (*Id.* at 86; Doc. No. 51-8 at 66-67.)

Plaintiff had a second meeting on January 30, 2015 with Defendants Peak and McGill. (Doc. No. 51-1 at 100.) Upon arriving at the meeting, Defendant McGill read to Plaintiff a list of

---

[3] Plaintiff disputes Ms. Elges' version of these events. Plaintiff testified that when she told Ms. Elges that they would have to pay Doug Goldberg and let him pay Eric Goldberg, Ms. Elges agreed to do so and stated she would plead new bookkeeper ignorance. (Doc. No. 51-1 at 84.)

concerns, including Plaintiff requiring an assistant to work overtime, not completing evaluations on time, failure to follow proper Purchasing Card ("P-Card") procedures, the cash box being short, the Make-A-Wish box being short, paying her sons to work athletic events, and using the $10 and $5 Dick's Sporting Good gift cards as tournament awards. (*Id.* at 100-05.)[4] Plaintiff tried to respond to each allegation during the meeting. (*Id.* at 101.)

ASD20's Policy GBEA Staff Ethics/Conflict of Interest provides, in relevant part, "No district employee shall participate in the selection or employment of any person who is a member of his/her family." (Doc. No. 51-12.) The record indicates that since July 2012, Plaintiff signed 45 checks to her son, Jared, and 21 checks to her son, Tyson, for work they performed as game workers at AAHS athletic events. (Doc. No. 51-1 at 102.) Plaintiff was not aware this was a violation of ASD20 policy. (*Id.*) Plaintiff contends "my principal, [Defendant] McGill, was fully aware of it and personally approved check requests to pay her sons for working at such events. See, e.g., ASD20_000126 (Tyson) and ASD20_000168 (Jared)." (Doc. No. 51-13 at 2.) Plaintiff further contends "asking family members to step in to work games was a common practice in the District high schools, and other workers with family relationships, including but not limited to, [Defendant] McGill's husband, worked at AAHS athletic events." (*Id.*)

ASD20's P-Card Program permitted ASD20 to provide credit cards to approved District employees who are authorized to purchase goods and services. (Doc. No. 51-14 at 3.) P-Cards issued to Principals had a $500.00 transaction limit. (*Id.* at 6.) The P-Card program prohibits split purchases made in order to circumvent the transaction limit. (*Id.* at 5.) Records show that on December 6, 2012, Plaintiff made three different purchases of cheerleader boots in amounts

---

[4] The record does not contain any indication beyond the general allegations leveled during the January 30, 2015 meeting as to when Plaintiff's evaluations were untimely.

of $487.40, $487.40, and $97.48. (Doc. No. 51-15.) Plaintiff purchased King Soopers gift cards in the amount of $735.00 in transactions amount of $500.00 and $235.00. (Doc. No. 51-1 at 215.) She testified this was the result of a brain lapse. (*Id.*)

Colorado High School Activities Association ("CHSAA") Bylaw 2010.1 provides, in relevant part:

> Individuals participating in any interscholastic athletic/activity sponsored and/or approved by the Association shall not accept cash or merchandise awards. Awards must be symbolic in nature with no functional or intrinsic value such as, but not limited to, letters, plaques, trophies, medals, ribbons, certificates and letter adornments and shall not exceed $50.00 in value exclusive of engraving. "Cash" includes such things as, but not limited to, remuneration in any form such as cash, money orders, gift certificates, scholarships (cash/check payment to school of choice is approved, not to student recipient), free or reduced price meals.

(Doc. No. 51-16.) During athletic tournaments, AAHS provided gift cards to Dick's Sporting Goods store in the amount of $10.00 to first place and $5 to second place. (Doc. No. 51-1 at 105-06.) Plaintiff denies this was a violation of CHSAA Bylaw 2010.1 because they did not see them as over the amateur status rule and it was essentially like a trophy for the tournament. (*Id.* at 105.) They had previously provided t-shirts to tournament and/or event winners. (*Id.*)[5]

---

[5] The court notes Defendants submitted a Summary Transaction Report related to AAHS athletic fundraising accounts over a five year time period, 2010-2015. (Doc. No. 51-17.) Defendants purport that the report shows monies raised by athletic programs in the course of fundraisers were never distributed to the appropriate charities. (Mot. at 7.) Defendants offered no explanation in interpreting the report. From what the court can discern in examining it, over a five year time span, two of fifteen fundraising accounts reflect a possible failure to distribute the total money raised in a fundraiser (offset by fundraiser expenses) to the appropriate charities. (*Id.*) Plaintiff testified she was the ultimate authority over the fundraising efforts. (Doc. No. 51-1 at 141.) She also testified that "sometimes [the athletic groups] are doing their part turning money in and I never see the monies going in and out because the process doesn't cross my desk, so I wasn't always aware if, in fact, they had been doing a fundraiser." (*Id.*) In any event, as Defendants offered no explanation as to this report and the court cannot determine with certainty it is interpreting the report correctly, this exhibit will not be treated as establishing an uncontroverted fact.

Plaintiff remained on leave after the January 30th meeting.  (*Id.* at 118.)  An Internal

Review Summary of Recommendations ("Summary"), signed by two Internal Reviewers and

dated February 5, 2015, indicates the internal investigation found numerous policy violations by

Plaintiff.  (Doc. No. 51-19.)[6]  Another meeting occurred on February 10, 2015 and in attendance

were Plaintiff, Plaintiff's counsel, Defendant Peak, Defendant McGill, and counsel for ASD20.

(Doc. No. 51-1 at 119.)  At this meeting, Plaintiff was informed that she was being removed

from her position as Athletic Director/Assistant Principal and being placed in the position of

Student Interventionist.  (*Id.* at 120.)  Dr. Peak read from a prepared statement, stating that it was

unnecessary to "rehash their concerns in detail again, but our most prominent issues involve the

expenditure of funds to athletes in violation of CHSAA rules, failure to adequately oversee

athletic and activity funds, and failure to ensure that personnel procedures are followed to protect

the safety and welfare of students."  (*Id.* at 121; Doc. No. 51-20.)  Plaintiff did not get a chance

to respond.  (*Id.* at 121.)  Plaintiff and her counsel requested a copy of the prepared statement as

well as the "source documents" pertaining to the investigation but AAHS would not provide

them.  (Doc. No. 51-1 at 120-21.)  Plaintiff began in her position as Student Interventionist on

February 18, 2015.  (*Id.* at 123.)[7]

---

[6] Plaintiff argues the Summary is hearsay and therefore, inadmissible.  (Resp. at 3.)  To the
extent the Summary is offered not for the truth of the matter asserted, but for the limited purpose
of establishing the information presented to Defendants following the internal audit, the
Summary is admissible.  *Murphy v. Pagosa Lakes Prop. Owner's Ass'n*, No. 13-cv-03445-PAB-
NYW, 2015 WL 1816573, at *3 n.3 (D. Colo. April 20, 2015).

[7] Throughout the briefing, Defendants argue Plaintiff's move to this position was a "transfer,"
rather than a demotion.  Though the distinction makes little difference to the analysis herein,
Plaintiff was moved from Athletic Director/Assistant Principal to Student Interventionist,
accompanied by a decrease in salary, as a result of allegations of policy violations.  An argument
that this action did not constitute a demotion is disingenuous at best.  Thus, for the sake of
simplicity, in this Order, the court refers to this move as a demotion.

On April 16, 2015, after Plaintiff was already in the Student Interventionist position, Krystal Whitson, Plaintiff's Secretary when she was Athletic Director, prepared a letter stating that Plaintiff directed her to take small amounts of cash, $10.00 to $20.00, out of the athletic event gate receipts throughout the year in order to pay for alcoholic beverages at the coaches' end of year banquet. (Doc. No. 51-21.) She further stated that she had previously saved anywhere from $300-$500 for this event. (*Id.*) Ms. Whitson submitted another letter dated May 27, 2015, in which she stated that after the Glenn Peterson Track meets, Plaintiff invited the meet workers and coaches to dinner. (Doc. No. 51-22.) Using the gate receipts from the track meet, Plaintiff paid for the dinner and alcoholic drinks. (*Id.*)[8]

On May 5, 2015 at 11:54 a.m., Ms. Elges sent an email to Defendant McGill stating that the soccer coach had asked her to locate $3,000.00 Plaintiff had transferred out of the boys' soccer account. (Doc. No. 51-23.)[9] In the email, Ms. Elges stated that on June 30, 2012, the previous bookkeeper, Susan Avila, had transferred $3,000.00 from the boys' soccer account to the general athletics account to cover the negative balance. (*Id.*) While Ms. Elges was looking for the $3,000.00 transfer, she discovered that on June 30, 2012, Ms. Avila also made five other transfers between athletic accounts in order to cover negative balances. (*Id.*) Ms. Avila has

---

[8] Plaintiff objects to the consideration of Ms. Whitson's letter as inadmissible hearsay. The court construes the letter such that, if called as a witness, Ms. Whitson could testify at trial to her own actions as described in the letter. To that extent, the court considers the letter's content. *See Murphy*, 2015 WL 1816573, at *3 n.3. *See also Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995) (stating that a party need not produce evidence in a form that would be admissible at trial, but the substance of the evidence must be admissible).

[9] Plaintiff also objects to the consideration of Ms. Elges' email as inadmissible hearsay. Similar to Ms. Whitson's letter, if called as a witness, Ms. Elges could testify at trial to her actions and findings as described in the email and the soccer coach could testify as to his own request to Ms. Elges to locate a $3000.00 transfer. To that limited extent, the court considers the email's content. *See Murphy*, 2015 WL 1816573, at *3 n.3; *Thomas*, 48 F.3d at 485.

testified she came up with the idea of transferring funds between accounts because she did not like seeing negative balances. (Doc. No. 51-24 at 49.) Plaintiff approved the transfers and stated that they created a paper trail so they would remember to later transfer the funds back. (*Id.*; Doc. No. 51-1 at 204.) Ms. Elges' email indicates the described transfers were not returned to the original accounts. (Doc. No. 51-23.)

Policy GBK sets forth an appeal procedure for employees who seek to resolve "a concern or complaint not associated with concerns regarding discrimination or harassment." (Doc. No. 51-25.) On April 14, 2015, Plaintiff submitted a Level 2 appeal regarding her demotion and addressed twelve allegations based solely on memory. (Doc. No. 51-26.) Pursuant to Policy GBK, Level 2 appeals are heard by the "Principal or Designee". (Doc. No. 51-25 at 1.) Because Plaintiff's appeal involved a decision made by her Principal, Defendant McGill, her appeal was escalated to a Level 3. (Doc. No. 51-1 at 131.) Level 3 appeals are usually heard by a "Principal's supervisor." (Doc. No. 51-25 at 1.) Because the Superintendent had already chosen the Principal's Supervisor, Defendant Karin Reynolds, for Plaintiff's Level 4 appeal, *see* Doc. No. 51-7 at 195-97, Defendant Susan Field, an Assistant Superintendent over Learning Services, was chosen. (*Id.*; Doc. No. 51-1 at 131.)

Dr. Field met with Plaintiff on April 21, 2015 from 3:45 p.m. to 5:15 p.m. (Doc. No. 51-28 at 47-48.) Plaintiff drafted a set of talking points that she took with her to the meeting and referred to from time to time. (Doc. No. 51-1 at 147-48.) Dr. Field drafted a letter denying Plaintiff's appeal and showed the draft to Defendant Peak. (Doc. No. 54-1 at 57.) She does not recall whether there were multiple drafts but she describes it as a working draft and testified that the two of them spent time on it. (*Id.*)

On May 5, 2015, Dr. Field issued the letter to Plaintiff concluding, "While your intentions may have been in good faith, your actions were in violation of many District 20 policies and procedures . . . . Your transfer from assistant principal/athletic director to teacher at Air Academy High School is within the statutory authority of the school district.  In my investigation, I have found no violation, misapplication, or misinterpretation of school district policy."  (Doc. No. 51-29 at 1, 3.)  She testified that several provisions were included at the request of Mr. Cohn and Defendant Peak.  (Doc. No. 54-1 at 130-31.)  Additionally, the letter included multiple allegations of which Plaintiff had been previously unaware.  (Doc. No. 51-18; Doc. No. 51-29 at 2; Doc. No. 51-20.)

Defendant Field's letter is dated the same day as Ms. Elges' email to Defendant McGill reporting the June 30, 2012 transfers of monies between accounts.  (Doc. No. 51-29.)  The allegations regarding the transfers are included in full in Defendant Field's letter, wherein she stated that her own investigation revealed these transfers.  (Doc. No. 51-29 at 2.)  In her letter, Defendant Field stated that Plaintiff had chosen not to respond to the allegations against her at the January 30, 2015 and the February 10, 2015 meetings.  (*Id.* at 1; Doc. No. 51-1 at 101.)  At the request of Mr. Cohn, Defendant Field included the statements, "During our April 21, 2015 meeting, you verbally requested remedy for administrative salary reinstatement for the remainder of the 2014-2015 school year.  This request is denied as you are currently working as a teacher." (Doc. No. 51-29 at 3; Doc. No. 54-1 at 130-31.)

Upon request of Defendant Peak, Defendant Field's letter also included reference to Plaintiff's failure to timely evaluate coaches from July 2008-2010.  (Doc. No. 51-29 at 2; Doc. No. 54-1 at 114.)  Plaintiff's performance evaluation for the 2010-11 school year included the

same criticism but stated, "Diane had not been evaluating coaches according to board policy in the last year or so but recommitted to those evaluations with gusto this year. Her teacher and coach evaluations were detailed and complete." (Doc. No. 54-1 at 113.) Additionally, Plaintiff's performance evaluation for the 2011-12 school year includes praise for, *inter alia*, evaluating coaches in a timely manner. (Doc. No. 54-1 at 2) ("She completed all her coaching evaluations in a timely manner and her feedback was measured and honest.") Defendant Field also included the allegation regarding Plaintiff's violation of CHSAA bylaws because Dr. Peak asked her to do so. (*Id.*; Doc. No. 51-29 at 2.)

Plaintiff subsequently filed her Level 4 appeal, which was being heard by Ms. Reynolds. (Doc. No. 51-30.) In that appeal, Plaintiff points out several allegations from the Level 3 denial regarding which she could not respond or properly appeal because she did not have sufficient information. (*Id.*) During the appeal, Ms. Reynolds met with Plaintiff for approximately one and one-half hours. (Doc. No. 51-1 at 163, 170.) Plaintiff again went through her talking points and each of the allegations of which she was aware, explaining how she understood the events that had occurred and her own actions. (*Id.* at 163-64.) On June 9, 2015, Ms. Reynolds issued a letter summarily denying Plaintiff's appeal, stating that she "found no policy violation in your transfer from assistant principal/athletic director to teacher at Air Academy High School as such a transfer is within statutory authority of the school district per Colorado Revised Statutes 22-63-106." (Doc. No. 51-31.)[10]

Plaintiff next filed a Level 5 appeal with the ASD20 Board of Education. (Doc. No. 51-32.) Board President, Defendant Van Matre, requested the Superintendent compile "some

---

[10]The court presumes Ms. Reynolds intended to refer to Colo. Rev. Stat. § 22-63-206 which allows a teacher in an administrative position to be transferred to a teacher position.

information for the [B]oard so that we could see for ourselves what some examples were of some of the concerns," specifically financial concerns, regarding Plaintiff.  (Doc. No. 51-33 at 13, 52-53.)  She further requested that such information be provided in a paper copy in a binder that would be left in a locked room in the boardroom.  (*Id*. at 54.)  At the July 23, 2015 Board meeting, the Board resolved to decide Plaintiff's Level 5 appeal on the basis of the documents submitted.  (Doc. No. 51-34 at 2.)

The Board members were not required to review any of the information submitted pursuant to Defendant Matre's request and she is only aware of two other Board members, Defendant Johnson and Defendant Strebe, that did so.  (*Id.*)  Defendant Van Matre reviewed the documents for less than thirty minutes and did not look through all of the documents.  (Doc. No 54-1at 58-59, 83.)  She is not aware how long Defendants Johnson and Strebe reviewed them.  (Doc. No. 54-1 at 58-59.)  Upon reviewing the materials, Defendant Van Matre did not come to a conclusion on whether Plaintiff had mishandled finances and she was not concerned about the appeal process.  (*Id.* at 66, 68, 71, 73, 76, 83.)

> Q.  Okay.  And based on your looking at that, then did you come to a conclusion regarding whether [Plaintiff] had mishandled finances in any way?
>
> A.  No, not a conclusion.  I simply saw that there was enough evidence that I could understand why – why this process had happened, and that's all I was really looking for.
>
> Q.  You were – were you looking for in that sense some validation that you felt the previous levels of the appeal process had – had made a proper determination on whether there had been a violation of the board policy?
>
> A.  No.  I wasn't concerned with the appeal process.

(*Id.* at 66.)  Defendant Van Matre thought her only "responsibility in this was to determine whether the [B]oard had a concern with [the Superintendent]'s performance in terms of adherence to policy."  (*Id.* at 83.)

The Board received a letter on August 4, 2015 from Plaintiff in which she resigned her position, effective immediately, with ASD20 after accepting employment with Douglas County High School as Assistant Principal/Activities Director.  (Doc. No. 51-1 at 30, 33; Doc. No. 51-35.)  At the August 6, 2015, Board meeting the Board approved Plaintiff's resignation.  (Doc. No. 51-36 at 3.)  The Board never discussed the matter, the allegations, and/or the appeal.  (Doc. No. 54-1 at 62-63.)  At the same meeting, the Board resolved Plaintiff's Level 5 appeal as follows, "That the Academy School District 20 Board of Education, following a careful review of the information forwarded to the Board regarding the Level 3 Complaint, has determined that there has been no violation, misapplication, misinterpretation, or inequitable use of any of the provisions of Board of Education, or administrative policies, and request that the President prepare a response in accordance with this motion."  (*Id.* at 6.)  On August 10, 2015, Defendant Van Matre sent a letter to Plaintiff reflecting the same.  (Doc. No. 51-38.)

**Legal Standard**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & Cnty. of Denver*, 36

F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).  A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence.  *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Concrete Works*, 36 F.3d at 1517.  Moreover, because Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys."  *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers").  At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record.  *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## Analysis

### 1. Procedural Due Process

Plaintiff's primary allegation in this case is that Defendants demoted her without due process in violation of the Fourteenth Amendment. To make this claim, Plaintiff must first show she had a property interest in continued employment with ASD20. *Langley v. Adams Cnty., Colo.*, 987 F.2d 1473, 1480 (10th Cir. 1993). In its order denying the individual Defendants' Motion to Dismiss, this court concluded Plaintiff had a property interest in her continued employment pursuant to Policy GCQF, which provides a licensed staff member "shall not be subject to disciplinary proceedings . . . for actions which were in good faith and in compliance with the district's administrative policies and procedures." (Doc. No. 37-2; Doc. No. 49 at 7-11). Thus, the question now before the court is whether Plaintiff received adequate due process prior to being demoted. *Langley*, 987 F.2d at 1480.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "'The essence of procedural due process is fair play; hence, the fundamental due process requirement is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Crow v. City of Colo. Springs*, No. 13–cv–02842–RBJ, 2014 WL 1775552, at *6 (D. Colo. May 5, 2014) (quoting *Patrick v. Miller*, 953 F.2d 1240, 1244 (10th Cir. 1992)).

> Due process requires that plaintiff have had an opportunity to be heard at a meaningful time and in a meaningful manner before termination. This requirement includes three elements: 1) an impartial tribunal; 2) notice of charges given a reasonable time before the hearing; and 3) a pretermination hearing except in emergency situations.

*Langley*, 987 F.2d at 1480 (internal citations and quotations omitted). There is no bright line rule determining the sufficiency of due process. The employee is entitled to "some kind of hearing" prior to the adverse employment action depriving her of her liberty interest. *Loudermill*, 470 U.S. at 542 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972)). "The procedural requisites and formality of pre-termination procedures vary depending on the importance of the interests involved and the nature of post-termination proceedings.'" *Crow*, 2014 WL 1775552, at *6 (quoting *Langley*, 987 F.2d at 1480). "[T]he adequacy of pre-termination procedures must be examined in light of available post-termination procedures." *Id.*

### a. Pre-Demotion Proceedings

Plaintiff attacks on many fronts the due process afforded her during the pre-demotion proceedings. First, she contends she was not presented with the charges against her within a reasonable time. (Resp. at 6-8.) As with due process in general, there is not a specific amount of time in which an employee must be provided notice of to the charges against them. Instead, "what constitutes timely notice is inevitably context-specific." *Crow*, 2014 WL 1775552, at *7. This court has noted that two days could constitute too short a timeframe for proper notice but found otherwise in a case in which the plaintiff was able to not only attend a pre-termination meeting with such notice but was also able to submit documents during the meeting that supported his position. *Id.* The Tenth Circuit has held that "[t]he necessary notice may come at

the hearing itself." *Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073, 1078 (10th Cir. 2011).

> Nothing in *Loudermill* suggests, nor do we hold, that a public employee is entitled to some type of 'pre-notification notice' of the charges against her or him. Likewise, *Loudermill* does not imply that, in conducting the pretermination hearing, there must be a delay between the 'notice' and the 'opportunity to respond' accorded to the public employee.

*Id.* (quoting *Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir. 1989)). "[T]he Tenth Circuit has upheld 'informal proceedings, such as pretermination warnings and an opportunity for a face-to-face meeting with supervisors, and even a limited conversation between an employee and his supervisor immediately prior to the employee's termination,' as sufficient to satisfy due process requirements." *Hays v. Park City Sch. Dist.*, 214 F. Supp. 3d 1162, 1184 (D. Utah 2016) (quoting *West v. Grand Cnty.*, 967 F.2d 362, 367 (10th Cir. 1992)). The sufficiency of notice is determined on a case-by-case basis. *Crow*, 2014 WL 1775552, at *7.

During the initial meeting on January 23, 2015, Plaintiff was told only that there were concerns regarding paying her son and paying volunteers who had not completed the district mandated process. (Doc. No. 51-1 at 79.) At the second meeting, held on January 30, 2015, the allegations against Plaintiff had expanded significantly to include Plaintiff requiring an assistant to work overtime, not completing evaluations on time, failure to follow proper P-Card procedures, the cash box being short, the Make-A-Wish box being short, paying her sons to work athletic events, violation(s) of the CHSAA policy prohibiting cash gifts to athletes, and misrepresenting that she checked three references prior to hiring a custodian who was later investigated for improper conduct with a student. (*Id.* at 100-05; Doc. No. 51-18.) At the February 10, 2015 meeting, Plaintiff was informed that she was being moved to the position of

Student Interventionist and was not given a chance to respond to allegations against her. (Doc. No. 51-1 at 121.) The prepared statement from which Dr. Peak read at the meeting indicates the purpose of the meeting was to inform Plaintiff that she was being moved to the Student Interventionist position, not to gain a response from Plaintiff regarding the allegations. (Doc. No. 51-20.)

The court finds troubling the sheer volume of allegations relayed only verbally and for the first time to Plaintiff during the January 30, 2015 meeting that essentially represented her only opportunity to respond. (Doc. No. 51-1 at 100-05; Doc. No. 51-18.) These circumstances could create a question of fact as to whether Plaintiff was afforded sufficient due process in her pre-demotion proceedings. Notably though, the court does not consider the adequacy of Plaintiff's notice and pre-demotion proceedings in a vacuum and instead must examine them in light of the available post-demotion procedures, addressed below. *See Crow*, 2014 WL 1775552, at *6.

Plaintiff also argues she was not afforded an impartial tribunal during the pre-demotion proceedings. (Resp. at 8-9.) Specifically, Plaintiff contends Defendant McGill, as her immediate supervisor and the person recommending her demotion, and Defendant Peak, who investigated the allegations against her and also recommended her demotion, were not impartial decision-makers in light of their respective roles. (*Id.* at 8.)

The court finds this does not violate Plaintiff's due process rights because Plaintiff's allegations do not prove either Defendants McGill or Peak were biased. "The mere showing that a supervisor initially recommended a [demotion] and then met with the employee prior to that employee's [demotion] is ordinarily insufficient to establish a constitutional violation." *Riggins*

*v. Goodman*, 572 F.3d 1101, 1114 (10th Cir. 2009) (citing *Grand Cnty.*, 967 F.2d at 368 (finding

that a meeting with the supervisor, who ultimately terminated the employee, provided "sufficient

notice and opportunity to respond to satisfy the pretermination due process requirements"); *see*

*also Locurto v. Safir*, 264 F.3d 154, 173–74 (2d Cir. 2001) (collecting cases and concluding that

a neutral adjudicator is not a necessary component of due process at a pretermination hearing, so

long as the plaintiff is afforded a hearing before a neutral adjudicator after termination); 2 Isidore

Silver, Public Employee Discharge & Discipline § 17.06 (3d ed. 2001) (noting that the

supervisor officiating at the initial pretermination meeting need not be impartial as it is often

assumed that the supervisor who best knows the charges, and who perhaps has even brought

them, is the most appropriate initial decision-maker.).

Finally, Plaintiff complains the January 23, 2015 and January 30, 2015 meetings were not

adequate for pre-demotion due process. (Resp. at 9-10.) In arguing these meetings were

sufficient, Defendants rely on cases in which the court found far less than full evidentiary

hearings prior to termination as sufficient due process. (Mot. at 15-18) (citing *Hennigh v. City of*

*Shawnee*, 155 F.2d 1249, 1256 (10th Cir. 1998); *Grand Cnty.*, 967 F.2d at 368-69). Plaintiff does

not argue she should have been afforded a full evidentiary hearing. Instead, she states, "In a case

like this one [], which involved numerous, fact-dependent issues spanning several years, fairness

clearly required something more than a brief meeting with a supervisor." (Resp. at 9.)

Plaintiff's concerns in this regard are not without legitimacy. Nevertheless, "the [pre-demotion]

hearing need not definitively resolve the propriety of the discharge. It should be an initial check

against mistaken decisions—essentially, a determination of whether there are reasonable grounds

to believe that the charges against the employee are true and support the proposed action."

*Loudermill*, 470 U.S. at 545–46.  Most significantly, "[t]he standards for a pretermination hearing are not stringent because of the expectation that a more formal post-termination hearing will remedy any resulting deficiencies."  *West*, 967 F.2d at 367.  Thus, the court must analyze the post-demotion proceedings before determining whether Plaintiff was afforded due process.

### b.  Post-Demotion Proceedings

#### (i)  Level 3 Appeal

In their Motion, Defendants accurately explain that a plaintiff is not entitled to extensive pre-termination proceedings due to the safeguards provided by post-termination proceedings. (Mot. at 17.)  Then, they cite *Benavidez v. City of Albuquerque*, 101 F.3d 620 (10th Cir. 1996) for the proposition that "when the employee has had a meaningful opportunity to explain his position and challenge his dismissal in pre-termination proceedings, the importance of the procedures in the post-termination hearing is not as great.  In this type of post-termination hearing, simply giving the employee 'some opportunity' to present his side of the case will provide a meaningful hedge against erroneous action."  (*Id.*)  Defendants cannot have it both ways.  They cannot argue minimal pre-demotion proceedings are sufficient because of the post-demotion proceedings available and then argue the same as to post-demotion proceedings.  At some point, an employee must be provided sufficient procedural due process.

Here, Plaintiff was able to appeal her demotion through three levels of appeal, pursuant to ASD20 policy.  In Plaintiff's first appeal, she addressed twelve allegations based solely on memory as Defendants never provided anything in writing related to the various allegations leading to her demotion.  (Doc. No. 51-26.)  In the May 5, 2015 letter denying Plaintiff's appeal,

Dr. Field stated that while Plaintiff may have been acting in good faith, her actions violated many ASD20 policies. (Doc. No. 51-29 at 1.)

It is not the court's duty, when considering whether a plaintiff was afforded adequate due process, to second guess the employer's conclusions and/or decision-making. In other words, the court does not decide whether the employer made the *right* decision in demoting or terminating an employee. *See Laird v. Gunnison Cnty.*, No. 04–cv–00687–PSF–BNB, 2007 WL 108391, at *9 (D. Colo. Jan. 10, 2007) ("[I]t is not within the employee's right to challenge the wisdom of the employer's decision, nor is it for this Court to review the prudence of such a decision."). However, the court does note certain anomalies in Defendant Field's letter denying Plaintiff's appeal that bring the due process afforded her into question.

In the letter, Defendant Field repeatedly refers to her "investigation" of the allegations. (Doc. No. 51-29 at 2.) In her deposition, though, Field stated that other than the meeting with Plaintiff, her process was limited to speaking with Dr. Peak, a decision-maker in Plaintiff's demotion, and Mr. Gregory. (Doc. No. 54-1 at 54, 57, 59, 102-03.) Defendant Field testified that she did not have any documents in her possession that she was going through when writing her decision. (*Id.* at 102-03.) Yet, she stated in her letter that her "investigation revealed six transfers initiated and approved by you that moved funds from specific team athletic accounts to 'gate receipts' and 'general athletics' to cover negative balances" on June 30, 2012. (Doc. No. 51-29 at 2.) Notably, Ms. Elges discovered the six transfers and reported them to Defendant McGill for the first time on May 5, 2015, the same date as Defendant Field's letter. (Doc. No. 51-23; Doc. No. 51-29.) Aside from the difficulty in understanding how Defendant Field was aware of these transfers early enough to include them in a letter dated the same date Ms. Elges

first reported the same, Plaintiff was certainly not afforded notice and an opportunity to respond to this allegation prior to Defendant Field's decision.

Additionally, Defendant Field provided an initial draft of her decision letter to Dr. Peak. (Doc. No. 54-1 at 57.) Dr. Peak specifically asked Defendant Field to include a statement that although Plaintiff claimed she "never asked your secretary to work past her work hours, she reports that she often worked past the scheduled hours and was never reimbursed for her overtime work." (Doc. No. 51-29 at 2; Doc. No. 54-1 at 120.) Defendant Field never spoke with Plaintiff's assistant or saw anything documenting such a statement. (Doc. No. 54-1 at 120.) Instead, Defendant Field testified that Dr. Peak asked her to add it and that he had made that finding in his own investigation. (*Id.*) Defendant Field also included allegations related to Plaintiff's completion of coaching evaluations and violations of CHSAA bylaws because Dr. Peak asked her to do so. (Doc. No. 51-29 at 2.)

Dr. Peak was one of the decision-makers in Plaintiff's demotion and this was an appeal from that decision. His level of involvement in determining aspects of this appeal raises many concerns, not the least of which is whether Plaintiff was afforded an impartial tribunal. The court notes the Tenth Circuit's holding that "[i]nvolvement of tribunal members in earlier proceedings in the same case does not overcome the presumption of honesty and integrity." *Riggins*, 572 F.3d at 1113-14 (quotations omitted). However, in the present case, Defendant Peak's involvement in this regard is concerning for two reasons. First, it is not clear from the record Defendant Field conducted her own investigation and/or reached her own conclusions regarding various matters raised in Plaintiff's appeal. Second, it does not appear Defendant

Peak's involvement was publicly known, and certainly not to the extent he seemingly participated.

It is undisputed Defendants never provided Plaintiff any documentation related to the allegations against her, their investigation, or a statement listing the reasons for her demotion. Along the same vein, there is a pattern throughout Plaintiff's appeals wherein she seems to get notice of the allegations against her in piecemeal fashion. As noted, she filed her Level 3 appeal noting that she was responding to the allegations that she could recall as she was not provided any documentation. In Dr. Field's letter, there are additional allegations about which Plaintiff had not been previously made aware. For example, Dr. Field states, "It was reported that you received cash boxes directly from all ticket sellers with completed reconciled reports, however, you failed to retain or forward those reports to the bookkeeper." (Doc. No. 51-29 at 2.) This allegation was not a part of the prepared statements read to Plaintiff during the January 30, 2015 and February 10, 2015 meetings. (Doc. Nos. 51-18, 51-20.) Also included in Dr. Field's letter was the allegation that Plaintiff used "funds from the athletic activities cash boxes and spent said funds on alcoholic beverages at local restaurants to entertain coaches." (Doc. No. 51-29 at 2.) This allegation was not included in any previous communication to Plaintiff. (Doc. Nos. 51-18, 51-20.) Indeed, this allegation was not asserted by anyone until April 16, 2015, well after Defendant Field's meeting with Plaintiff, when Ms. Whitson submitted her letter including these allegations. (Doc. No. 51-21.) These issues raise considerable questions regarding Plaintiff's notice of the allegations against her, as well as whether she was provided a reasonable opportunity to be heard.

### (ii) Level 4 Appeal

Plaintiff complains Ms. Reynolds, who heard her Level 4 appeal, was not an impartial tribunal because she was in Plaintiff's direct chain of command, had signed off on Plaintiff's performance evaluations, Ms. Reynolds and Defendant McGill had discussed Plaintiff's job performance, and Ms. Reynolds had been kept abreast of Defendant McGill's investigation and demotion of Plaintiff from the outset.  (Resp. at 15.)  As previously noted, however, even direct involvement in earlier proceedings does not disqualify an individual from participating in an employee's appeal.  *Riggins*, 572 F.3d at 1114.  Moreover, "'exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness' of a later adversary hearing."  *Id.* (quoting *Mangels v. Pena*, 789 F.2d at 838).  *See also Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 747 (10th Cir. 1991) ("Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not disqualify a decisionmaker.").

In her Level 4 appeal, Plaintiff repeatedly notes allegations set forth in her Level 3 denial to which she cannot respond and/or properly appeal because she does not have enough information.  (Doc. No. 51-30 at 1-6.)  As one example, in her letter denying Plaintiff's Level 3 appeal, Dr. Field stated that an internal audit indicated that from July 1, 2012 – January 23, 2015, there were 175 transactions that were not consistent with audit expectations and include at least one violation each.  (Doc. No. 51-29 at 3.)  Defendants never provided Plaintiff any documentation regarding the audit performed and none of the previous statements read to her included this information.  (Doc. Nos. 51-18, 51-20.)  Thus, Defendant Field's letter represents

the first time Plaintiff was presented with this information.  In her Level 4 Appeal, Plaintiff, not

surprisingly, stated:

> 12. District internal audit.  This finding is completely unclear.  Is Dr. Field
> claiming that during that time Ms. Shuck herself had 175 transaction errors?  Are
> these athletic department errors, or does she mean AAHS as a whole?  Ms. Shuck
> was never made aware of any violation of auditing expectations by the
> bookkeeper, the principal or the district auditor.  The audit reports are never
> shared with her, but go to the principal and bookkeeper.  We cannot respond to
> this allegation without a significant amount of additional information.

(Doc. No. 51-30 at 5.)

### (iii) Level 5 appeal

Plaintiff's final appeal to the Board of Education raises additional concerns for the court.

The denial of her Level 4 appeal did not include any substantive information regarding the

allegations against her.  Thus, Plaintiff's notice of the allegations against her remained

unchanged.  More concerning to the court is Defendant Van Matre, the Board President's,

description of the appeal.  She stated that in hearing the Plaintiff's appeal, which was limited to

the documentation she and two other board members reviewed, she was not concerned with the

appellate process or whether Plaintiff actually did the things of which she was accused.  Instead,

she was concerned solely with whether the Superintendent, Dr. Hatchell, had violated any

policies during the demotion and/or appellate process.  (Doc No. 54-1 at 66, 83.)  However, Dr.

Hatchell played no role whatsoever in Plaintiff's demotion and subsequent appeal.  His only

participation was to delegate his appellate review to Ms. Reynolds.  Thus, Defendant Van

Matre's explanation, which was unrelated to the merits of Plaintiff's appeal, is nonsensical and

leaves questions regarding whether Plaintiff was provided a meaningful opportunity to be heard.

Although establishing procedural due process is not a particularly high burden to meet, in light of the piecemeal fashion in which Plaintiff was provided notice of the allegations against her, lack of information provided to Plaintiff regarding the allegations and/or the subsequent investigation, as well as the court's concerns regarding whether Plaintiff had a meaningful opportunity to be heard, the court finds Plaintiff has established a question of fact regarding whether she was afforded sufficient due process with regard to her demotion. *See, c.f., Gale v. Unintah Cnty.*, No. 2:13-cv-725-TC, 2015 WL 4645024, at *14 (D. Utah Aug. 4, 2015) (finding question of fact as to whether plaintiff was afforded procedural due process prior to termination based on fact he did not receive his personnel file until four days after the evidentiary hearing as his job performance would have been relevant to the allegations against him as well as his inability to take the testimony of certain witnesses prior thereto).

[O]nce a plaintiff establishes a constitutional violation, the burden shifts to the defendant to show by a preponderance of the evidence that it would have reached the same result absent the violation." *McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205, 1213 (10th Cir. 2000) (citing *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 285–87 (1977) (once plaintiff shows infringement of constitutional right, defendant must "show [ ] by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the [constitutional violation]."); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270–71 & n.21 (1977) (proof of constitutional violation shifts to defendant the "burden of establishing that the same decision would have resulted even had [the constitutional violation not occurred]")).

Although Defendants state repeatedly that Plaintiff's demotion was based on violations of policy, which indisputably occurred, they bear the burden to offer evidence that the demotion would have occurred even if Plaintiff had received full due process. Defendants offered no such evidence in their briefing. *See, c.f., Leardini v. Charlotte-Mecklenberg Bd. of Educ.*, No. 3:09–CV–264, 2012 WL 1828897, at *3 (W.D.N.C. May 18, 2012) (affirming trial court's refusal to give jury instruction on affirmative defense that the plaintiff would have been terminated even if he had received a hearing where one witness stated that she had "no idea" whether he would have been terminated following a hearing. "In no way did Defendants present evidence, by way of testimony or document, that met the evidentiary burden necessary to require this Court to give an instruction on the § 1983 affirmative defense.").[11]

## 2. Defendant Field

Defendants request Defendant Field be dismissed because she had no involvement in Plaintiff's demotion. (Mot. at 19-20; Reply at 7-8.) However, Plaintiff's procedural due process claim focuses on whether she was provided due process before and after her demotion. The claim is not based upon whether in fact she should have been demoted. Dr. Field, along with Dr. Peak, was the reviewing authority on Plaintiff's Level 3 appeal and therefore, directly participated in the due process provided to Plaintiff.

---

[11] The court notes had Defendants met their burden and shown by a preponderance of the evidence that they would have reached the same decision, Plaintiff's claim would still survive for trial because "the employee may still obtain damages for emotional distress attributable to the deficiencies in procedure if the employee can convince the trier of fact that the distress is attributable to the denial of procedural due process itself rather than to the justified termination." *Montgomery v. City of Ardmore*, 365 F.3d 928, 937 (10th Cir. 2004) (quotations omitted). Plaintiff has requested damages for emotional distress in relation to her due process claim, *see* Doc. No. 6 at 6-7, and Defendants do not address this issue in their request for summary judgment.

Although they fail to cite any legal authority supporting this request in their Motion, Defendants cite to *Dill v. City of Edmond, Okla.* 155 F.3d 1193 (10th Cir. 1998) in their Reply indicating that the Tenth Circuit affirmed judgment in favor of Defendant Preston as to the plaintiff's procedural due process claim because there was no evidence he participated in the decision to transfer the plaintiff. *Id.* at 1207. However, *Dill* is distinguishable from the present case. In *Dill*, the plaintiff asserted procedural due process, tortious interference with business relations, and conspiracy claims against Defendant Preston in relation to an employment transfer. *Id.* at 1201. The trial court granted judgment as a matter of law against the plaintiff's procedural due process claim, and the Tenth Circuit affirmed, based on a finding that the complained of change to the plaintiff's employment resulting from the transfer did not trigger procedural due process protections. *Id.* at 1207. Additionally, the procedural due process claim was based upon a requirement that the plaintiff could not be transferred without cause. *Id.* at 1206. Thus, unlike the present case, the lack of participation in the subject transfer negated a procedural due process claim as the transfer was the only action relevant to the same. *Id.*

"The personal participation required to hold a person accountable in a § 1983 action is personal participation in the alleged constitutional violation." *See Stovall v. Raemisch*, No. 14–cv–02069–KMT, 2015 WL 5280908, at *3 (D. Colo. Sept. 10, 2015). As discussed in detail above, Defendant Field was personally involved in the due process Plaintiff alleges was inadequate. Thus, she is a proper party to this case.

Therefore, it is

**ORDERED** that "Defendants' Partial Motion for Summary Judgment" (Doc. No. 51) is

**DENIED**.

Dated this 29th day of September, 2017.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge